No. 60,139

PHYLLIS L. HEAD, *Appellant*, v. PLATTE COUNTY, MISSOURI, *et al.*, *Appellees*.

(749 P.2d 6)

Opinion filed January 15, 1988.

*Roger W. McLean*, of Barnett and Ross, Chartered, of Kansas City, argued the cause and was on the brief for appellant.

*Stephen J. Dennis*, of Niewald, Waldeck, Norris and Brown, of Overland Park, argued the cause and was on the brief for appellees.

The opinion of the court was delivered by

LOCKETT, J.: Plaintiff, Phyllis Head, a Kansas resident, filed a personal injury action against Platte County, Missouri, and Tom Thomas, Sheriff of Platte County, alleging negligence in the the arrest and false imprisonment of the plaintiff in Kansas. Specifically, plaintiff alleged that employees of Platte County negligently prepared the arrest warrant in Missouri. The Kansas district court, applying Missouri sovereign immunity law, granted defendants' motion for summary judgment. Plaintiff appeals. We reverse and remand for further proceedings, determining that when agents of a sister state or its subdivision enter this state, neither the public policy of Kansas nor principles of judicial comity require us to recognize the sister state's attributes of sovereign immunity. *State v. Holcomb*, 85 Kan. 178, 116 Pac. 251 (1911).

Plaintiff is a resident of Overland Park, Kansas. Platte County, Missouri, is a political subdivision of the State of Missouri. Tom Thomas, Sheriff of Platte County, is a resident of Platte County, Missouri.

On May 2, 1984, Mr. Harry House of Parkville, a Missouri merchant, completed a bad check complaint form and presented it to the prosecuting attorney of Platte County, Missouri. On the form, Mr. House provided the following description of the suspect:

Name: Phyllis Marshall, d/b/a/ Empire Marketing
Address: Unknown
Date of Birth: Unknown
Driver's license number: Unknown
Sex: Female
Race: White
Physical description: Overweight, bleached blond hair, capped teeth
Suspect's vehicle: 1983 Dodge convertible
Other information as to whereabouts of suspect: 5705 Metcalf, Shawnee Mission, Kansas.

The Office of the Prosecuting Attorney for Platte County, Missouri, received and reviewed the information provided by Mr. House. Determining that there was probable cause, a complaint was prepared for a state warrant, then forwarded to a circuit judge who determined there was probable cause to issue an arrest warrant for a Phyllis Marshall. On May 4, 1984, the Platte County Sheriff's Department received from the Office of the Deputy Circuit Clerk of Platte County, Missouri, a warrant for the arrest of a Phyllis Marshall and another document entitled "Information for Platte County Sheriff's Department" which had been prepared by an unidentified employee of the office of the Deputy Circuit Clerk of Platte County, Missouri. That document contained some of the information provided by Mr. House and also added the suspect's date of birth as 1-10-58 and her alternate residence as 7806 Aberdeen, Prairie Village, Kansas. The additional facts in the information sheet corresponded to the date of birth and former residence of the plaintiff.

Subsequently, the warrant was forwarded to Kansas and law enforcement officials in Prairie Village, Kansas, attempted to execute the warrant at 7806 Aberdeen. They were informed that this was the former address of Phyllis Marshall, that she had married and now was Phyllis Head, and resided at 12647 West 105th Street, Overland Park, Kansas. The Prairie Village dis-

patcher contacted the Overland Park Police Department and requested them to serve the warrant on "Phyllis Marshall a/k/a Phyllis Head, 12647 West 105th Street, white female, d/o/b 1-10-58, height 5'7", weight 120 pounds, brown hair, and green eyes." That description matched the plaintiff, but not the suspect described in the original complaint. The source of the second description is not clear.

Overland Park police officers arrested Phyllis Head at her home. Mrs. Head denied that she was the person who had written the check. The warrant was confirmed by the Platte County Sheriff's Department. Mrs. Head's husband was required to come home from work to take care of their baby and Phyllis Head was handcuffed and transported to the Overland Park jail where she was booked, held, and eventually released. The following day, plaintiff and Mr. House met. House immediately informed the Platte County prosecutor's office that the wrong woman had been arrested.

Head filed suit in Johnson County, Kansas, against Platte County, Missouri; the Sheriff of Platte County; the prosecuting attorney of Platte County; and the City of Overland Park. (The latter two parties were dismissed and are not involved in this appeal.) Head alleged that defendants negligently failed to adequately train and supervise their employees and failed to establish and implement policies concerning the filing and execution of arrest warrants. Plaintiff contends that she was falsely arrested and imprisoned as a result of the negligent training of employees of Platte County, Missouri, who provided the false identifiers to Kansas law enforcement officials.

The defendants filed a motion for summary judgment. At the hearing on the motion, defendants contended they were immune from suit pursuant to Missouri sovereign immunity law. Mo. Rev. Stat. § 537.600 (1978). The district court first determined that it had personal jurisdiction of the parties. The district court then ruled, "As a matter of sound public policy, governmental agencies ought to be able to rely upon their State's laws on immunity in order to adequately insure against alleged wrongful acts on the part of those agencies and its employees," and granted the motion for summary judgment. Plaintiff appeals, contending

Missouri sovereign immunity law does not apply to tortious injuries occurring in Kansas.

The issue of whether another state's sovereign immunity law applies in Kansas is an issue of first impression. However, in *State v. Holcomb*, 85 Kan. 178, this court recognized that when a sister state engages in activities in Kansas, it does not exercise sovereign power over the citizens of this state.

In *Holcomb*, the City of Kansas City, Missouri, claimed a right to exemption from Kansas taxation of a water plant owned by that city and situated in Wyandotte County, Kansas. Kansas had laws making itself, political subdivisions, and the federal government exempt from taxation. Kansas City, Missouri, claimed it was entitled to the same consideration, since it was also a sovereign. In rejecting this argument, the *Holcomb* court observed that "[a] state is sovereign only within its own boundaries and its laws have no extraterritorial force." 85 Kan. at 181. It also held that when a state or any of its municipalities comes within the boundaries of another state, it does not carry with it any of the attributes of sovereignty, and it is subject to the laws of such other state the same as any other proprietor. 85 Kan. at 184-85.

*Holcomb* was relied upon by the California Supreme Court in *Hall v. University of Nevada*, 8 Cal. 3d 522, 105 Cal. Rptr. 355, 503 P.2d 1363 (1972), *cert. denied* 414 U.S. 820 (1973).

In *Hall*, California plaintiffs brought a negligence action in a California state court against the University of Nevada and the State of Nevada for injuries sustained when an automobile operated by defendants' agent caused an accident in California. Service was made pursuant to a California statute providing a method for service over nonresidents who had operated motor vehicles in the state. The Superior Court of the City and County of San Francisco entered an order quashing service of summons on the basis of Nevada's sovereign immunity.

The Supreme Court of California, relying on *Holcomb*, reversed and remanded the case for trial, concluding that "[w]hen the sister state enters into activities in this state, it is not exercising sovereign power over the citizens of this state and is not entitled to the benefits of the sovereign immunity doctrine as to those activities unless this state has conferred immunity by law

or as a matter of comity." 8 Cal. 3d at 524. The United States Supreme Court denied *certiorari*, 414 U.S. 820 (1973).

On remand, Nevada filed a pretrial motion to limit the amount of damages pursuant to a Nevada statute which placed a limit of $25,000 on any award in a tort action against the State pursuant to its statutory waiver of sovereign immunity, arguing that the Full Faith and Credit Clause of the United States Constitution required enforcement of the Nevada statute by the California courts. This motion was denied, the case went to trial, and plaintiffs were awarded damages of $1,150,000. The California Court of Appeal affirmed the trial court. *Hall v. University of Nevada*, 74 Cal. App. 3d 280, 141 Cal. Rptr. 439 (1977). After the California Supreme Court denied review, the United States Supreme Court granted *certiorari*, 436 U.S. 925 (1978), to consider whether a state may enforce its sovereign immunity from suit in the courts of another state.

In *Nevada v. Hall*, 440 U.S. 410, 59 L. Ed. 2d 416, 99 S. Ct. 1182, *reh. denied* 441 U.S. 917 (1979), in an opinion authored by Justice Stevens, the United States Supreme Court affirmed the California decision, holding that there was no constitutional bar to California's assertion of jurisdiction over Nevada. The Court reasoned that nothing in Art. III authorizing the judicial power of the United States or in the Eleventh Amendment limitation on that power provided any basis to limit the judicial powers that California had exercised.

More significantly, the Court held that the full faith and credit clause of the United States Constitution (Art. IV, § 1) does not require a state to apply another state's law in violation of its own legitimate public policy. 440 U.S. at 422. In *Hall*, California had provided by statute for jurisdiction in its courts over residents and nonresidents alike to allow those negligently injured on its highways to secure full compensation for their injuries in California courts. The United States Supreme Court held that full faith and credit did not require California to abandon this public policy by surrendering jurisdiction to Nevada or limiting respondents' recovery to the $25,000 Nevada statutory maximum. The Court recognized that certain constitutional provisions may place limitations upon the sovereignty of the states. However, the Court concluded that such provisions do not imply that any

one state's immunity from suit in the courts of another state is anything more than a matter of comity, and, further, that nothing in the Constitution authorized or obligated the Court to frustrate California's policy of fully compensating those negligently injured on its highways. 440 U.S. at 425-26.

By holding in *Nevada v. Hall* that nothing in the Constitution requires one state to apply a sister state's sovereign immunity in tort suits against the sister state, the United States Supreme Court left Kansas free to recognize Missouri's sovereign immunity as a matter of Kansas public policy. In the case at bar, the district court held that Kansas public policy favored the application of Missouri sovereign immunity to defendants. We disagree. Our decision in *Holcomb* firmly established that a sister state has no right to exercise its sovereign immunity within the borders of this state.

Further, it has long been the public policy of Kansas to compensate its citizens and those within its borders for injuries occurring in Kansas which result from negligent acts outside of this state. This policy can be determined by the state's statutes governing the liability of residents, nonresidents, and Kansas governmental entities for tortious acts that injure an individual in this state. The statutory policy is stated by (1) K.S.A. 60-308(b)(2), which allows a plaintiff to bring suit in Kansas to recover damages for injuries occurring in this state which resulted from negligent conduct outside Kansas, and (2) the Kansas Tort Claims Act, K.S.A. 75-6101 *et seq.*, which holds Kansas governmental entities liable for damages caused by their employees' acts or omissions within this state subject to specified exceptions.

Following *Nevada v. Hall*, we are also free to recognize Missouri sovereign immunity as a matter of comity. Judicial comity is a principle by which the courts of one state or jurisdiction give effect to the laws and judicial decisions of another, not as a matter of obligation, but out of deference and respect. *In re Miller*, 228 Kan. 606, Syl. ¶ 3, 620 P.2d 800 (1980). Comity is not binding on the forum state, but is a courtesy extended to another state out of convenience and expediency. *Philadelphia v. Austin*, 86 N.J. 55, 64, 429 A.2d 568 (1981).

We believe that, when considering comity, Kansas courts

should give primary regard to the rights of its own citizens and persons who are within the protection of this state. To hold that Missouri could not be sued in Kansas would result in granting greater immunity to our sister state than the immunity which our citizens through the legislature have bestowed upon our state government. If Missouri has sovereign immunity within our borders, a Kansas resident would be denied all recovery for injury caused by Missouri agents in this state, even though if agents of the State of Kansas had committed the same act, recovery could be permitted under our Tort Claims Act. No state should give effect to the law of another on principles of comity when the effect would be deleterious to the public policy of the forum state.

We hold that the public policy of this state is that a sister state is sovereign only within its own boundaries, and its immunity laws have no extraterritorial force.

Since the other issues raised by the parties were not determined by the trial court, they will not be considered for the first time on appeal.

Reversed and remanded for further proceedings.

McFARLAND, J., dissenting: I believe that the majority opinion has reached a result that is erroneous and will have far-ranging deleterious consequences.

The majority opinion is summarized in the following excerpt therefrom:

"We believe that, when considering comity, Kansas courts should give primary regard to the rights of its own citizens and persons who are within the protection of this state. To hold that Missouri could not be sued in Kansas would result in granting greater immunity to our sister state than the immunity which our citizens through the legislature have bestowed upon our state government. If Missouri has sovereign immunity within our borders, a Kansas resident would be denied all recovery for injury caused by Missouri agents in this state, even though if agents of the State of Kansas had committed the same act, recovery could be permitted under our Tort Claims Act. No state should give effect to the law of another on principles of comity when the effect would be deleterious to the public policy of the forum state.

"We hold that the public policy of this state is that a sister state is sovereign only within its own boundaries, and its immunity laws have no extraterritorial force."

This result is predicated upon the false premise that Missouri

law grants immunity in a factual situation where Kansas does not—hence the rationalization that "public policy" requires the result reached in order to protect Kansas citizens.

Mo. Rev. Stat. § 537.600 (1978) provides:

"1. *Such sovereign or governmental tort immunity as existed at common law in this state prior to September 12, 1977, except to the extent waived, abrogated or modified by statutes in effect prior to that date, shall remain in full force and effect*; except that, the immunity of the public entity from liability and suit for compensatory damages for negligent acts or omissions is hereby expressly waived in the following instances . . . ." (Instances not applicable herein.) (Emphasis supplied.)

*State ex rel. Eli Lilly & Co. v. Gaertner*, 619 S.W.2d 761 (Mo. App. 1981), sheds some interesting history on Mo. Rev. Stat. § 537.600, as follows:

"The common law doctrine of immunity from tort liability, and official immunity have undergone significant judicial and legislative changes in recent years. In the case of *Jones v. State Highway Comm'n*, 557 S.W.2d 225 (Mo.banc 1977), our Supreme Court put to rest the common law doctrine of sovereign immunity from tort liability. However, the doctrine was abrogated prospectively as to all claims arising on or after August 15, 1978, to give the legislature the necessary time in which to consider the issue. Our legislature responded by resurrecting sovereign tort immunity by enacting § 537.600, RSMo. 1978 which provided, in substance, that such sovereign tort immunity as existed at common law in our state prior to September 12, 1977, except to the extent waived, abrogated or modified by statutes in effect prior to that date, would remain in full force and effect; excepting, in certain circumstances not applicable to the present facts.

"It is clear that the *Jones* court did not, in abrogating sovereign immunity, intend to abrogate official immunity. Our colleagues in the Western District, in *Jackson v. Wilson*, 581 S.W.2d 39 (Mo. App. 1979), have so found. When a public official is acting in a judicial fashion, i.e., exercising judgment and discretion he is immune, in the absence of willful wrongdoing, from suits filed as a result of his actions. The policy underlying the doctrine of official immunity is the necessity for a vigorous and effective government which can operate free from the fear of suits filed as a result of its actions." 619 S.W.2d at 763.

The *Eli Lilly* case involved a medical malpractice action against certain doctors employed by the Malcolm Bliss Mental Health Center, which is a facility operated by the Missouri Mental Health Commission. The doctors claimed governmental immunity on the basis they were Missouri public officials acting in their official capacities when the alleged malpractice occurred in 1978. In denying immunity to the doctors, the Missouri Court of Appeals reasoned as follows:

"A public office is the right, authority and duty, created and conferred by law, by which for a given period, either fixed by law or enduring at the pleasure of the creating power, an individual is invested with some portion of the sovereign functions of the government, to be exercised by him for the benefit of the public. The individual so invested is a public officer. *State ex rel. Pickett v. Truman*, 333 Mo. 1018, 64 S.W.2d 105, 106 (Mo. banc 1933). That portion of the sovereign's power delegated to the officer must be exercised independently, with some continuity and without control of a superior power other than the law. *Kirby v. Nolte*, 349 Mo. 1015, 164 S.W.2d 1, 8 (Mo. banc 1942); *See State v. Pigg*, 363 Mo. 133, 249 S.W.2d 435, 437-38 (Mo. banc 1952). Whether or not a public employee is a public officer is dependent upon the legal and factual circumstances involved. *See* e.g., *Metcalf v. Mitchell*, 269 U.S. 514, 520, 46 S. Ct. 172, 173, 70 L. Ed. 384 (1926) (consulting engineer is not a public official); *State ex rel. Scobee v. Meriwether*, 355 Mo. 1217, 200 S.W.2d 340, 342 (Mo. banc 1947) (court reporter not a public officer); *State ex rel. Hull v. Gray*, 91 Mo. App. 438, 443 (1902) (chief engineer of city hall not an officer but mere employee); *Reese v. Danforth*, 486 Pa. 479, 406 A.2d 735, 740 (1979) (public defenders are not public officials). *But see McSween v. State Live Stock Sanitary Bd.*, 97 Fla. 749, 122 So. 239, 249 (1929) (state veterinarian is a public official). *See generally* 67 C.J.S. Officers §§ 7-10 (1978); 63 Am. Jur. 2d *Public Officers and Employees* §§ 10-12 (1972).

"Our legislature has expressed the intent to provide care to Missouri residents suffering from mental illness or retardation. Section 202.020. The superintendents of the various care facilities, one of which is Malcolm Bliss Mental Health Care Center, are appointed by the director of the department of mental health. The director is appointed by the state mental health commission. Sections 202.040 and 202.035. The duties of both the directors and superintendents of mental health facilities are defined by statute. *E.g.* §§ 202.050, 202.051, 202.110, 202.115, 202.120, 202.150, 202.153, 202.180, 202.183, 202.187, 202.190, 202.193. Their duties and authority are conferred by law. As administrators of a state owned facility the directors and superintendents exercise some portion of the sovereign's power in the performance of their statutorily designated duties. They are, therefore, public officers entitled to official immunity. *See Konigsberg v. Hunter*, [308 F. Supp. 1361 (W.D. Mo. 1970)] n.5 at 1365. The same cannot be said for physicians employed in the mental [health] care facilities. In the performance of their duties they are answerable to the facility's superintendent. Their duties and authority are not set out in the statute as are those of the directors and superintendent but are such as the superintendent of the care facility determines. Such duties do not involve any exercise of the sovereign's power, rather the physicians are required, when employed by the state, to render the identical services as required when employed in the private sector, i.e., to provide mental health care. While our legislature has provided for employment of physicians by the superintendents of mental health facilities such statutory provisions did not create immunity for these public employees. *State ex rel. Hull v. Gray, supra*, at 442.

"The mere fact that defendants are compensated by public funds is not evidence of legislative intent that they be afforded immunity. *C.F. Ferri v. Ackerman*, 444 U.S. 193, 100 S. Ct. 402, 408, 62 L. Ed. 2d 355 (1979).

"Counsel has not referred us to, nor has our research revealed any cases wherein state employed physicians have been characterized as either employees or officials. However, we find, as a result of the foregoing analysis that the defendant physicians are not public officials entitled to immunity but are employees subject to suit in which their liability for medical malpractice may or may not be established.

"Furthermore, even if the doctors are considered to be public officers, the performance of their duties does not require the exercise of 'discretion' in the legal sense of that term. The purpose of official immunity is to protect public officers from the consequence of erroneous or negligent judgments made in the execution of their official duties. The duties of all public officials involve the exercise of functions for the public benefit. The discretionary decisions, the protection of which is the purpose of the doctrine of official immunity, are those which are a manifest exercise of the sovereign's power—those decisions which 'go to the essence of governing.' Cf. Jones v. State Highway Comm'n, [557 S.W. 2d 225 (Mo. 1977)] at 230.

"Prior decisions have characterized the activities of public officials as either 'ministerial' or 'discretionary.' Ministerial duties are those of a clerical nature performed in obedience to mandate without the exercise of judgment and are therefore not immune from suit. Jackson v. Wilson, [581 S.W.2d 39 (Mo. App. 1979)] at 43, Yelton v. Becker, 248 S.W.2d 86, 89 (Mo. App. 1952). Defendants would characterize all official duties, other than those which fall within the 'ministerial' category, as 'discretionary.' To do so would extend the doctrine of official immunity from tort liability to all decisions made by public officials or employees for almost every act requiring the use of discretion or judgment. Kalloo v. Englerth, 433 F. Supp. 504, 512 (D.V.I. 1977). Shielding officials for decisions other than those made in the exercise of the sovereign's power which go to the essence of governing, extends the doctrine of official immunity beyond its original intent to promote smooth and effective government. The defendants' decision in this case, i.e., the administering of sodium amytal to Mrs. Brown, was a medical one. It was not a decision which went to the essence of governing nor was it an administrative decision resulting from the exercise of governmental discretion. Compare the facts in the instant case with those in Jackson v. Wilson, supra, upon which the respondent based his decision that the defendants were immune from suit. In the Jackson case plaintiff was injured while diving into a pool maintained by the Missouri Department of Natural Resources. He sued the Director of Parks and Recreation alleging, inter alia, that 'as titular head of the state park system he was guilty of negligently exercising his discretion and judgment regarding the formulation of policies for supervision of St. Francois State Park.' The Jackson court quoting with approval our Supreme Court's statement in Jones, supra, that no action in tort would lie for decisions 'which go to the essence of governing', held the director immune from suit. Id. at 43.

"The defendant doctors are being sued as treating physicians, not as titular heads of any department nor are they being sued for allegedly negligent administrative policy decision, i.e., those 'which go to the essence of governing.' They

are not being sued for an erroneous decision requiring the exercise of governmental judgment and discretion but for an allegedly erroneous medical decision for which they should answer without a shield of immunity. *Henderson v. Bluemink*, 511 F.2d 399, 402-03 (D.C. Cir. 1974)." 619 S.W.2d at 764-65. (Emphasis supplied.)

The Missouri court, in a tort action arising after the September 12, 1977, 'deadline' set in Mo. Rev. Stat. § 537.600, clearly recognized that torts arising from the exercise of ministerial or clerical duties are not immune from suit.

A Missouri case more factually similar to the one before us is *Smith v. Lewis*, 669 S.W.2d 558 (Mo. App. 1983). The case was originally decided by the Missouri Court of Appeals on October 4, 1983. Later, it was transferred to the Missouri Supreme Court. On May 23, 1984, the Court of Appeals' opinion was readopted. The *Smith* case involved a false imprisonment action where through clerical error an arrest warrant was not recalled and the plaintiff was arrested on November 17, 1981. Two of the defendants were J. Joseph Lewis, Jackson County Director of the Division of Family Services, and Austin Van Buskirk, Jackson County Director of the Department of Judicial Records. The trial court dismissed the action as to these parties. In reversing, the Missouri Court of Appeals stated:

"In their motions to dismiss below, Lewis and Van Buskirk urged that each was protected from suit by official immunity. Van Buskirk also claimed judicial immunity because of his status as a court employee selected by and serving at the pleasure of the judges of the 16th Judicial Circuit. The order of dismissal by the trial court did not state which of the various grounds set out in respondents' motions was adopted as the basis for the order. On this appeal, Van Buskirk argues that official immunity or judicial immunity are alone sufficient to warrant affirmance of the dismissal. The brief filed by Lewis fields no argument on the point.

"Assuming that the claim of immunity survives as to both Lewis and Van Buskirk and that the conduct complained of by each occurred in the course of activities associated with the respective offices held by Lewis and Van Buskirk, it is plain that the availability of immunity cannot be ascertained until the nature of the act or acts which brought about execution of the stale warrant has been set out.

"*Official immunity, the insulation of a public officer from tort liability, depends upon whether an act is discretionary or ministerial. If the former, the official is immune, but he is subject to liability for negligently performing ministerial acts. Oberkramer v. City of Ellisville*, 650 S.W.2d 286, 295 (Mo. App. 1983). *A discretionary act is one requiring the exercise of reason in determining*

*how or whether the act should be done, while a ministerial function is that of a clerical nature which a public officer is required to perform without regard to his own judgment concerning the propriety of the act. Jackson v. Wilson,* 581 S.W.2d 39, 43 (Mo. App. 1979). In the case of officials in supervisory positions, negligence in hiring unqualified persons to fill subordinate positions falls within the protected area of discretionary acts for which the official is immune. *Sherill v. Wilson,* 653 S.W.2d 661, 669 (Mo. banc 1983).

"In the present case, plaintiff Smith alleged that the defendants procured her unlawful arrest while 'acting within the scope of their official responsibilities.' *Within the limits of official conduct, Lewis and Van Buskirk could have acted in a discretionary or ministerial function in processing the warrant. It yet remains, however, to be established how the event came about and what was the participation, if any, of Lewis or Van Buskirk. The applicability of official immunity is therefore equally uncertain depending entirely on an examination of the facts under the discretionary/ministerial test.* A ruling on the defense of official immunity must await that time.

"The argument by Van Buskirk that he is entitled to 'quasi-judicial' immunity likewise need not be addressed on the merits for want of sufficient facts as to how the event complained of occurred. It is true, as Van Buskirk points out, that some cases have applied the doctrine of judicial immunity to court clerks where the act at issue was performed by the clerk at the express direction of the judge. *The mere status of a defendant as a clerk of the court, however, does not itself impart a cloak of absolute immunity. As in all other cases of official immunity, the nature of the act and the circumstances under which it was performed are essential ingredients in testing the availability of the defense."* 669 S.W.2d at 563. (Emphasis supplied.)

This *Smith* decision is in accord with our *Cook v. City of Topeka,* 232 Kan. 334, 654 P.2d 953 (1982), also involving a court clerk's failure to recall a warrant. In *Cook,* we discussed discretionary versus ministerial acts and the fact that the Kansas Tort Claims Act (K.S.A. 75-6101 *et seq.*) does not provide immunity for acts ministerial in nature. Likewise, the limited scope of judicial function immunity was discussed (whether the clerk was acting at the express direction of a judge). The *Eli Lilly* case previously discussed, involving the doctors, is wholly compatible with our decision on similar issues in *Durflinger v. Artiles,* 234 Kan. 484, 673 P.2d 86 (1983). It would appear that as far as sovereign immunity relative to the facts herein is concerned, Missouri and Kansas law is virtually identical.

Missouri immunity was raised as a defense in this case at the trial court level. The journal entry granting the motion for summary judgment contains the following statement as to what transpired at the hearing thereon:

"The Court then inquires of plaintiff's counsel whether he admits that the defendants have immunity for plaintiff's claims if Missouri law applies. Plaintiff's counsel advises the Court that the defendants would have immunity under Missouri law if it applies, but argues that Missouri law does not apply."

The court then concluded, in part:

"(5) Defendants Thomas and Platte County are immune under Missouri law [from] the claims of plaintiff . . . ."

The issue was apparently never researched or briefed. Plaintiff's counsel inappropriately, but simply, threw in the towel on this point. Inasmuch as the purported immunity in Missouri as opposed to liability under Kansas law for the alleged tortious act is the basic argument advanced for ignoring the rules of comity, the question of whether or not immunity exists in Missouri remains a viable issue in this appeal.

The cases relied on in the majority opinion involved rather unique situations where the sister state had employees physically present in the forum state committing acts which were the basis of the litigation. In the case before us, the alleged tort occurred solely in Missouri—the negligent inclusion of erroneous information in the warrant. No Missouri defendants were ever in the state and the arrest in Kansas is not alleged to have been done by agents for the State of Missouri.

In *State v. Holcomb*, 85 Kan. 178, 116 Pac. 251 (1911), Kansas City, Missouri, was operating a water treatment plant on Kansas soil and the issue was whether or not the plant was subject to Kansas taxation.

By far the more significant case is *Nevada v. Hall*, 440 U.S. 410, 59 L. Ed. 2d 416, 99 S. Ct. 1182, *reh. denied* 441 U.S. 917 (1979). In this case an employee of the University of Nevada was driving a vehicle owned by the State of Nevada on official business when he had an automobile accident on a California highway wherein California citizens were injured. Nevada had a $25,000.00 cap in any tort action involving its waiver of sovereign immunity. The California jury awarded the injured plaintiffs $1,150,000.00. In a six to three decision, the United States Supreme Court permitted the California award to stand. The majority opinion states:

"In this case, California's interest is the closely related and equally substantial

one of providing 'full protection to those who are injured on its highways through the negligence of both residents and nonresidents.' App. to Pet. for Cert. vii. To effectuate this interest, California has provided by statute for jurisdiction in its courts over residents and nonresidents alike to allow those injured on its highways through the negligence of others to secure full compensation for their injuries in the California courts.

"In further implementation of that policy, California has unequivocally waived its own immunity from liability for the torts committed by its own agents and authorized full recovery even against the sovereign. As the California courts have found, to require California either to surrender jurisdiction or to limit respondents' recovery to the $25,000 maximum of the Nevada statute would be obnoxious to its statutorily based policies of jurisdiction over nonresident motorists and full recovery. The Full Faith and Credit Clause does not require this result." 440 U.S. at 424.

In conclusion, the court stated:

"It may be wise policy, as a matter of harmonious interstate relations, for States to accord each other immunity or to respect any established limits on liability. They are free to do so. But if a federal court were to hold, by inference from the structure of our Constitution and nothing else, that California is not free in this case to enforce its policy of full compensation, that holding would constitute the real intrusion . . . ." 440 U.S. at 426-27.

The facts of the tort occurring on California highways and the low cap on Nevada awards were the justifications for the decision. The sharply worded dissent written by Justice Blackmun and joined by Chief Justice Burger and Justice Rehnquist discussed the history of sovereign immunity and concluded that even the extreme circumstances in the Nevada case are no justification for the majority's decision. The dissent by Justice Rehnquist makes a strong and learned argument that the holding of the majority opinion is faulty on constitutional grounds. Footnote 24 to the majority opinion states:

"California's exercise of jurisdiction in this case poses no substantial threat to our constitutional system of cooperative federalism. Suits involving traffic accidents occurring outside of Nevada could hardly interfere with Nevada's capacity to fulfill its own sovereign responsibilities. We have no occasion, in this case, to consider whether different state policies, either of California or of Nevada, might require a different analysis or a different result." 440 U.S. at 424.

Inasmuch as the majority's holding is based upon the tort having been committed on a California highway and the low cap on Nevada tort awards against the state, there is absolutely no reason to assume the majority would extend the holding to a case

such as is before us where the tort did not occur in the forum state and there is no disparity between the relief available in the forum state and the sister state.

I would affirm the district court, although on a different rationale than that expressed by the court, all as is set forth in this dissenting opinion.