Michael TAYLOR, et al., Plaintiffs,

v.

Paula PHELAN, et al., Defendants.

Civ. A. No. 88–2150–L.

United States District Court,
D. Kansas.

July 7, 1992.

Robert B. Van Cleave, Gates & Clyde, Chartered, Overland Park, Kan., Frank D. Menghini, Jeanne Gorman Rau, Douglas M. Greenwald, McAnany, Van Cleave & Phillips, P.A., Kansas City, Kan., for plaintiffs.

J. Emmett Logan, Morrison & Hecker, Kansas City, Mo., for defendants.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

This matter is currently before the court on defendant's Motion for Summary Judgment (Doc. # 119). The plaintiffs in this case are Michael Taylor, Sr. and Brenda Taylor as individuals and as parents and guardians of Michael Andrew Taylor and as surviving heirs and co-administrators of the estate of Jessica Taylor. The plaintiffs are residents of the state of Kansas. The defendants in this case are Paula Phelan, as an individual and a member of the Kansas City, Missouri Police Department, the Kansas City Board of Police Commissioners, and the members of the Kansas City Board of Police Commissioners in their official capacities. Defendants are all residents of the state of Missouri. This court has jurisdiction pursuant to 28 U.S.C. § 1332. The plaintiffs have brought negligence claims against Paula Phelan in her individual capacity and against the Kansas City, Missouri Board of Police Commissioners and the members of the Kansas City, Missouri Board of Police Commissioners in their official capacities on a respondeat superior theory for the negligence of Paula Phelan and Bradley Wessler, who are both members of the Kansas City, Missouri Police Department.[1]

On April 27, 1992, a hearing was conducted in this court on defendants' Motion for Summary Judgment, at which time the court took the motion under advisement. For the reasons set forth below, defendants' Motion for Summary Judgment is granted.

### I. Summary Judgment Standards

■ A motion for summary judgment gives a judge an initial opportunity to assess the need for a trial without weighing the evidence or determining credibility. Summary judgment is appropriate "if the pleadings, depositions, answers to interrog-

---

1. Plaintiffs' original complaint included a civil rights claim under 42 U.S.C. § 1983. However, plaintiffs have subsequently abandoned that claim. Accordingly, summary judgment is granted to defendants on plaintiffs' § 1983 claim.

atories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The requirement of a "genuine" issue of fact means that the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. at 2511–12.

The party who files a motion for summary judgment has the initial burden of demonstrating the absence of a genuine issue of material facts concerning its claims. This burden may be met by showing that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to show that there is a genuine issue of material fact left for trial. *Anderson*, 477 U.S. at 256, 106 S.Ct. at 2514. The nonmoving party may not simply rest on its pleadings in the case but has the affirmative duty to come forward with facts to establish that a genuine issue exists necessitating a trial in the case. *Id.* Thus, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Id.* The court must consider the record in the light most favorable to the party opposing the motion. *Bee v. Greaves*, 744 F.2d 1387, 1396 (10th Cir. 1984), *cert. denied*, 469 U.S. 1214, 105 S.Ct. 1187, 84 L.Ed.2d 334 (1985). More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex*, 477 U.S. at 327, 106 S.Ct. at 2554.

## II. Factual Background

The facts of this case are indeed tragic, and the court is painfully aware of the devastating effects these events must have had on all parties to this litigation.

On or about September 25, 1986, plaintiffs Michael and Brenda Taylor became aware that an individual by the name of Michael Moore had assaulted and sexually molested their daughter, Jessica Taylor. The incident occurred some eleven months before the plaintiffs became aware of it when Moore, a cousin of Michael Taylor, Sr., accompanied the Taylor family on a visit to friends in Kansas City, Missouri. After numerous examinations by medical doctors and consultations with social workers, the plaintiffs decided to report the incident to the appropriate law enforcement agency, which was the Kansas City, Missouri Police Department.

On or about October 21, 1986, plaintiffs contacted the Kansas City, Missouri Police Department. The case was assigned to Detective Paula Phelan in the Sex Crimes Unit. On October 22, 1986, the plaintiffs filed a report with Detective Phelan, who interviewed plaintiffs and Jessica Taylor and made an audio and video tape of the interview with Jessica Taylor. In that interview Jessica Taylor described the sexual assault made upon her by Moore.

On or about October 24, 1986, Moore voluntarily turned himself in for questioning to the Kansas City, Missouri Police Department, but was allowed to be released upon his agreement to return for a scheduled polygraph examination on October 28, 1986. On the day the polygraph examination was to take place, Moore contacted Detective Phelan and stated he did not want to take the polygraph. Later that same afternoon, Moore again contacted Detective Phelan, informing her he had changed his mind and would take the polygraph. He was re-scheduled for October 29, 1986, at which time he neither responded nor called to cancel his appointment.

During the week of October 24, 1986, plaintiffs made repeated contacts with Detective Phelan, and were told that the poly-

graph examination had been scheduled and then re-scheduled at the request of Moore. During these contacts with Detective Phelan, plaintiffs made it known to Detective Phelan that they had concerns for their safety due to the fact that Moore lived in close proximity to their residence.

On October 31, 1986, Detectives Phelan and Wessler came to plaintiffs' home in Kansas City, Kansas, to obtain a medical report during their regular investigation shift. During the visit, Detective Phelan assured Mrs. Taylor that everything was being done to investigate the matter and a warrant would be issued for Moore's arrest. During the visit, plaintiffs indicated to Detective Phelan the close proximity in which Moore lived to their home.

Over the next ten days, plaintiffs had a number of telephone conversations concerning whether or not the warrant had been issued in Missouri for the arrest of Moore. These telephone conversations were with members of the Sex Crimes Unit of the defendant police department.

The matter was subsequently referred to the Clay County prosecutor's office, which applied for a warrant for Moore's arrest. On November 7, 1986, the Clay County Circuit Court issued a warrant for the arrest of Moore on sodomy and sexual abuse charges. On that date, Detective Wessler telephoned Moore at Moore's Kansas home and informed him that warrant had been issued for his arrest. Moore told Detective Wessler that he would voluntarily surrender the next day, which he failed to do. There was no further contact between Detective Wessler or any other member of the police department and Moore.

On the evening of November 12, 1986, Moore broke into the Taylor's house, shot plaintiff Michael Taylor, Sr. in the eye, barricaded himself in a room with Jessica Taylor and Michael Andrew Taylor, poured gasoline on the children and set them afire. Jessica Taylor died as a result of the injuries she sustained and Michael Andrew Taylor was severely injured. After his rampage, Moore committed suicide.

## III.  Choice of Law Issues

■ Defendants contend that the court should apply Missouri law to determine their liability for plaintiffs' injuries. They assert that Missouri, unlike Kansas, recognizes no special relationship exception to the public duty doctrine. They maintain that the determination of whether to apply the special relationship exception is not a choice of law issue, but a matter of defining the duties defendants are alleged to have breached. They argue that since each of these duties derives from Missouri statutes and rules, their scope must be determined in accordance with Missouri law.

Contrary to defendants' assertions, whether to apply Kansas or Missouri law is a quintessential choice of law issue. "A federal court sitting in diversity must apply the substantive law of the state in which it sits, including that state's choice of law rules." *Raymark Industries, Inc. v. Stemple*, 714 F.Supp. 460, 465 (D.Kan.1988) (citing *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941); *Robert A. Wachsler, Inc. v. Florafax Int'l, Inc.*, 778 F.2d 547, 549 (10th Cir.1985)). The Kansas Supreme Court has held that "in an action for recovery of damages for injuries sustained in Kansas which were the result of a negligent act in another state, the liability of the defendant is to be determined by the laws of this state." *Ling v. Jan's Liquors*, 237 Kan. 629, 634–35, 703 P.2d 731 (1985); *see also Raymark Industries, Inc.*, 714 F.Supp. at 465; *Wessinger v. Vetter Corp.*, 685 F.Supp. 769, 772 (D.Kan.1987). Thus, Kansas law must be applied to determine defendants' liability for plaintiffs' injuries.

■ Defendants also contend that the court should recognize the sovereign and official immunity afforded them under the laws of Missouri both as a matter of constitutional law and judicial comity. Missouri law offers governmental entities and their employees much greater immunity protection than does Kansas law. Defendants maintain that subjecting them to suit in Kansas without affording them the sovereign and official immunity to which they would be entitled under Missouri law will

interfere significantly with their capacity to fulfill their sovereign responsibilities. Defendants additionally argue that subjecting them to suit in Kansas without providing them the sovereign and official immunity to which they would be entitled in Missouri would have a chilling effect on investigations crossing the state line.

Defendants are not entitled to recognition of the sovereign and official immunity afforded them under the laws of Missouri. Although Kansas law does not afford governmental entities the sweeping immunities defendants claim are conferred by Missouri law, it nonetheless affords them sufficient protection to enable them to fulfill their sovereign responsibilities. *See Nevada v. Hall,* 440 U.S. 410, 99 S.Ct. 1182, 59 L.Ed.2d 416 (1979). Kansas is also a sovereign, and, as the court's opinion in *Nevada v. Hall* makes clear, the Full Faith and Credit clause does not require Kansas to apply Missouri law in violation of its own legitimate public policy. *Id.* at 421–22, 99 S.Ct. at 1188–89.

In *Head v. Platte County,* 242 Kan. 442, 749 P.2d 6 (1988), the Kansas Supreme Court addressed the issue of whether Missouri sovereign immunity law applies to tortious injuries occurring in Kansas. In *Head,* Overland Park, Kansas police officers arrested the plaintiff at her Overland Park home pursuant to a warrant issued by the Office of the Deputy Circuit Clerk of Platte County, Missouri, resulting from a bad check complaint. The merchant who had filed the complaint met with the plaintiff and immediately informed the Platte County prosecutor's office that the wrong woman had been arrested. The plaintiff filed suit, alleging that the defendants negligently failed to train and supervise their employees and failed to establish and implement policies concerning the filing and execution of arrest warrants. She contended that she was falsely arrested and imprisoned as a result of the negligent training of employees of Platte County, Missouri, who provided the false identifiers to Kansas law enforcement officials. *Id.* at 443–44, 749 P.2d 6. The district court, applying Missouri sovereign immunity law, granted defendant's motion for summary judgment. *Id.* at 444, 749 P.2d 6.

The Kansas Supreme Court reversed, holding that "when agents of a sister state or its subdivision enter this state, neither the public policy of Kansas nor the principles of judicial comity require us to recognize the sister state's attributes of sovereign immunity." *Id.* at 442, 749 P.2d 6 (citing *State v. Holcomb,* 85 Kan. 178, 116 P. 251 (1911). The court noted that no constitutional bar exists to Kansas' assertion of jurisdiction over Missouri and "the full faith and credit clause of the United States Constitution does not require a state to apply another state's law in violation of its own legitimate public policy." *Id.* at 446, 749 P.2d 6 (citing *Nevada v. Hall,* 440 U.S. 410, 99 S.Ct. 1182, 59 L.Ed.2d 416 (1979). The court found Missouri sovereign immunity law contrary to Kansas public policy and refused to recognize it as a matter of comity. *Id.* at 447, 749 P.2d 6.

This court finds the Kansas Supreme Court's holding in *Head v. Platte County, Missouri* controlling. Based on that reasoning, this court finds that the defendants in this action are not entitled to recognition of the sovereign and official immunity afforded them under the laws of Missouri. As set out below, however, application of Kansas law leads to the same ultimate result, the dismissal of plaintiffs' case.

## IV. Legal Duty Owed by Defendant to Plaintiff

To recover for negligence under Kansas law, a plaintiff must prove the existence of a duty, breach of that duty, injury, and a causal connection between the duty breached and the injury suffered. *Wicina v. Strecker,* 242 Kan. 278, 280–81, 747 P.2d 167 (1987). Thus, violation by the defendant of a legal duty owed to the plaintiff is a necessary element of any tort claim. The existence of a legal duty is a question of law to be determined by the court. *Durflinger v. Artiles,* 234 Kan. 484, 488, 673 P.2d 86 (1983). It is because the court concludes that the defendants did not breach a duty owed by them to the plaintiffs under Kansas law that the court must turn the plaintiffs away without the oppor-

tunity for recovery against these defendants in the face of the appalling atrocity which Moore perpetrated.

■ It is generally held in Kansas that the duty of a law enforcement officer to protect citizens against criminal acts is a duty owed to the general public, the breach of which does not give rise to a cause of action in favor of any specific individual. *Robertson v. City of Topeka*, 231 Kan. 358, 644 P.2d 458 (1982). Absent some special relationship with or breach of a specific duty owed to an individual, liability will not arise for damages. *Hendrix v. City of Topeka*, 231 Kan. 113, 120, 643 P.2d 129 (1982). The court in *Dauffenbach v. City of Wichita*, 233 Kan. 1028, 667 P.2d 380 (1983) held that such a special relationship can arise in two circumstances. The first of these is where there is an affirmative act by a police officer which causes injury. *Id.* at 1033, 667 P.2d 380. The *Dauffenbach* court stated that examples of situations within this first category were officers placing an individual under arrest or officers committing an assault. *Id.* The second circumstance in which the *Dauffenbach* court found a special duty may arise is when a specific promise or representation by an officer is made under circumstances creating justifiable reliance by the individual. *Id.*

Plaintiffs advance three different theories supporting a finding that a special relationship existed between plaintiffs and defendants in this case, each of which plaintiffs argue is sufficient to find that a special relationship existed. The first of these is that the failure of the defendants to expedite the arrest of Moore following the plaintiffs' complaint regarding the sexual molestation of Jessica Taylor operated to create a special relationship. Plaintiffs' second theory is that assurances made by defendants regarding the safety of plaintiffs, upon which plaintiffs relied to their detriment, created a special relationship. Plaintiffs' third theory is that the actions of Detective Wessler in calling Moore and informing him that a warrant had been issued for his arrest increased the danger to the plaintiffs, thereby creating a special

relationship. Upon a careful examination of Kansas case law regarding the special relationship exception to the public duty doctrine and relevant cases from other jurisdictions, this court finds that none of plaintiffs' theories operated to create a special relationship under the facts of this case.

The mere fact defendants were dilatory in effectuating the arrest of Moore is not sufficient to create a special relationship. The court sees no distinction between the duty of law enforcement officers to conduct an investigation and arrest criminals following a civilian complaint and their duty to enforce the laws and prevent criminal behavior from occurring in the first place. Both are duties the police owe the general public.

In *Robertson v. City of Topeka*, 231 Kan. 358, 644 P.2d 458 (1982), the defendant police officers responded to plaintiff's call for assistance in removing a third party, Danner, from plaintiff's property. The plaintiff informed the officers that Danner was wrongfully on plaintiff's property and that Danner was intoxicated and would likely burn plaintiff's house down if he were not removed. The officers refused to effect the removal of Danner and instead directed plaintiff to leave the premises. Shortly after the police officers left, Danner did indeed burn plaintiff's house to the ground. Despite the fact that the officers were present on the scene at a time when the criminal conduct that gave rise to plaintiff's injuries was imminent and that the plaintiff had specifically advised the officers of the threat presented by Danner, the Kansas Supreme Court concluded that no special relationship or specific duty existed. *Id.* at 364, 644 P.2d 458.

The court also finds the factual circumstances in *Doe v. Hendricks*, 92 N.M. 499, 590 P.2d 647 (Ct.App.1979) analogous to the case at bar. *Doe* is cited in *Dauffenbach v. City of Wichita*, 233 Kan. 1028, 667 P.2d 380 (1983) as authority for the existence of the special relationship exception. In *Doe*, the parents of a sexual assault victim brought a negligence action against the city, its police chief and its police de-

partment. On returning home from school at 3:40 p.m. the victim, aged 12, was accosted and dragged into an abandoned house by an adult male. Two neighbor children saw the abduction and immediately telephoned the police. The dispatcher immediately took the report into the office of the chief of police, who was the only officer available to respond to the call. In delivering the report, the dispatcher interrupted the officer's conference with an out-of-state sheriff who was investigating a grain theft. The Chief of Police continued his discussion with the visiting sheriff who left at 4:00 p.m. *Id.* at 649.

Because the police had not responded to the call, two of the boys who had witnessed and reported the incident went to the police station. At 3:57 p.m. Officer Larry Vialpando arrived and met the boys coming out of the station. The boys explained the situation to Vialpando and he immediately drove to the abandoned house, arriving there at 4:02 p.m. The victim and the assailant were discovered nude in the house. Seventeen minutes had passed between the time of the telephone call to the dispatcher and Vialpando's arrival at the scene of the assault. *Id.*

The *Doe* court found that no special relationship existed between the victim and the police officers. The court found that although the police owed the boy a public duty of protection (which did not appear to have been performed with alacrity), under the circumstances the tragic event that occurred did not allow the recovery of damages.

This court sees no distinction between the failure of the police in *Robertson* and *Doe* to apprehend the suspects prior to their criminal acts and the failure of the police in the case at bar to effectuate the arrest of Moore prior to his criminal acts committed against the plaintiffs. In fact, the case for a special relationship in the case at bar is weaker than in *Robertson*, since there is no allegation that these defendants were present at a time when the criminal conduct that injured plaintiffs was imminent, that they received a specific warning of a crime that was about to be committed, or that they had power or authority to take specific steps to prevent the crime.

Plaintiffs attempt to distinguish their situation from those in *Robertson* and *Doe* due to the fact that defendants' dilatory actions in apprehending Moore occurred *after* the plaintiffs had reported the crime to the police. Plaintiffs cite several cases that provide for a special relationship between police and persons who aid in the apprehension or prosecution of criminals. *See Schuster v. City of New York,* 5 N.Y.2d 75, 180 N.Y.S.2d 265, 154 N.E.2d 534 (1958); *Estate of Tanasijevich v. City of Hammond,* 178 Ind.App. 669, 383 N.E.2d 1081 (1978). Plaintiffs argue that those cases support a determination that a special relationship arises between the police and individual members ·of the public who file criminal complaints.

The court sees no basis in Kansas law for the automatic creation of a special relationship between police and individual members of the general public who make a criminal complaint. Such a rule would be an unwarranted extension of *Dauffenbach* and could result in allowing any individual who reports a crime and is subsequently victimized by the suspect to state a claim against the officers who failed to make an arrest in time to prevent the latter act of violence. This would have the potential result of rendering police officers liable for repeat crime by criminal suspects. Additionally, there is a strong societal interest that police conduct thorough investigations of criminal suspects in order to establish the validity of citizen complaints and prevent the risk of arresting innocent persons. If an officer is aware that he or she may be liable for criminal acts committed by a suspect after a citizen complaint has been made, that officer may be tempted to arrest the suspect prematurely, without first conducting a thorough investigation to see if there are sufficient grounds to substantiate the citizen complaint. If such a rule is to be adopted it should not be by this court.

The *Schuster* and *Tanasijevich* cases cited by plaintiffs involve distinct fact situations not present in the case at bar, and do

not support a general proposition that once a citizen reports a crime, a special relationship with the police is created. In *Schuster*, the police actively called upon persons in possession of any information regarding the whereabouts of a dangerous criminal (the infamous Willie Sutton), to communicate such information in aid of law enforcement. *Schuster*, 180 N.Y.S.2d at 270, 154 N.E.2d at 538. Schuster responded to an FBI flyer with information that resulted in the capture of Sutton. Wide publicity was given to Schuster's aid in the case, and Schuster subsequently received death threats, of which he notified police. Three weeks later Schuster was shot to death. *Id.* 180 N.Y.S.2d at 268, 154 N.E.2d at 536. The court found that where the government had made active use of Schuster to aid in the capture of Sutton, the government owed a reciprocal duty to protect Schuster from harm. *Id.* 180 N.Y.S.2d at 270, 154 N.E.2d at 538. The *Tanasijevich* case is identical to *Schuster* in that the court based its finding of a special relationship on the fact that Tanasijevich had actively engaged in helping the police with an investigation of gangs.

The case at bar differs from *Schuster* and *Tanasijevich* in that the plaintiffs were not actively sought by police to aid in the capture of Moore. Instead, plaintiffs came to the police to report a crime committed by Moore against their person, as any citizen would. Instead of actively using a citizen to aid in their investigation of criminal acts, as occurred in *Schuster* and *Tanasijevich*, the defendants in this case were merely carrying out their public duty of responding to a citizen complaint. Without more, the mere fact that defendants were dilatory in effectuating the arrest of Moore is not sufficient to create a special relationship.

■ Plaintiffs' second theory as to the creation of a special relationship is that defendants made assurances to plaintiffs regarding plaintiffs' safety upon which plaintiffs detrimentally relied. Plaintiffs cite *Dauffenbach v. City of Wichita*, 233 Kan. 1028, 667 P.2d 380 (1983) and *Hendrix v. City of Topeka*, 231 Kan. 113, 643

P.2d 129 (1982) in support of their argument that Kansas law would recognize a special relationship based upon the assurances they contend Detective Phelan gave them. However, each of these cases makes clear that a "specific promise" of protection is necessary in order to create a special relationship based upon detrimental reliance. *Dauffenbach*, 233 Kan. at 1033, 667 P.2d 380; *Hendrix*, 231 Kan. at 121, 643 P.2d 129.

A thorough review of the factual record of this case does not reveal any specific promises of protection made by any of the defendants upon which plaintiffs could be said to have relied to their detriment. The only thing revealed by the factual record is that defendants made blanket assurances to plaintiffs that everything would be alright and plaintiffs should not worry about Moore and should go about their normal business. It is a function of the job of a police officer to reassure citizens and calm their fears. If an exception to the public duty doctrine were created every time police officers made blanket assurances to citizens, the exception would swallow the rule. In order to succeed on their theory that a special relationship was created due to plaintiffs' reliance on assurances made by defendants, plaintiffs must be able to point to some specific promise of protection made by defendants upon which they relied, rather than just blanket assurances. This plaintiffs have failed to do.

■ Plaintiffs' final theory for the creation of a special relationship is that the actions of Detective Wessler in telephoning Moore and informing Moore there was a warrant for his arrest increased the risk of danger to the plaintiffs. Plaintiffs cite *Dauffenbach*, 233 Kan. at 1028, 667 P.2d 380, in support of their argument that a special relationship can arise when there is an affirmative act by an officer which increases the risk of injury. However, *Dauffenbach* makes clear that it is the affirmative action of the officer, and not of some third party, that must cause the injury in order to create a special relationship under those circumstances. *Id.* at 1033, 667 P.2d 380. The court states that "examples of

situations within [that] category are placing an individual under arrest or committing an assault." *Id.* Similarly, in *Hendrix*, the court referred to affirmative acts directly causing injury that might give rise to a special relationship, such as the "use of excessive force in making an arrest or against a person in custody." *Hendrix*, 231 Kan. at 121, 643 P.2d 129. The actions of Detective Wessler in telephoning Moore caused no direct injury to plaintiffs and therefore cannot be classified within this category.

Defendants owed plaintiffs no legal duty for which a breach could give rise to a negligence claim. As a result, whether or not the defendants performed at the level to be expected of the police and their superiors is not the question. Any duty breached here was a duty to the general public under Kansas law and no claim for damages lies.

IT IS, THEREFORE, BY THE COURT ORDERED THAT defendants' motion for summary judgment (Doc. # 119) is granted. Plaintiffs claims are dismissed with prejudice.