**Michael MABERRY, Plaintiff,**

v.

**Sameer SAID, S.A.S. Auto Sales, Inc., and Citizens Bank & Trust, Defendants.**

**No. 94–2416–JWL.**

United States District Court,
D. Kansas.

Dec. 29, 1995.

Michael S. Martin, Bernard E. Brown, Jeffrey P. Johnson, Law Office of Bernard E. Brown, Westwood, KS, for plaintiff.

Michael S. Martin, Alan P. Blinzler, Overland Park, KS, for Sameer Said, S.A.S. Auto Sales, Inc.

Justin J. Johl, Kevin J. Karpin, Shook, Hardy & Bacon, Overland Park, KS, Michael D. Doering, Mark W. Untersee & Associates, P.C., Kansas City, MO, for Citizens Bank & Trust.

### MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

Plaintiff Michael Maberry alleges that he was sold a truck without being told that the odometer had rolled over. He brings this action against defendants Sameer Said, S.A.S. Auto Sales, Inc. (SAS) and Citizens Bank & Trust (Citizens) citing a wide variety of legal theories. Presently before the court are Citizens's motion for summary judgment (Doc. # 58); Mr. Said's and SAS's joint motion for summary judgment (Doc. # 62); and Citizens's motion for summary judgment on Mr. Maberry's credit reporting claims (Doc. # 71). For the reasons set forth below, the court makes the following rulings: (1) Missouri law governs plaintiff's common law fraud claims; (2) material questions of fact preclude summary judgment on plaintiff's Federal Odometer Act, Kansas Consumer Protection Act and common law, credit reporting tort claims; (3) the Federal Trade Commission (FTC) holder rule authorizes the affirmative assertion of claims; (4) plaintiff's damages under the FTC holder rule are limited to the amount paid under the contract; (5) the Missouri Unlawful Merchandising Practices Act does not govern allegedly fraudulent conduct occurring in Kansas; (6) a material fact question exists regarding whether or not SAS is Mr. Said's alter ego; and (7) plaintiff failed to give SAS and Mr. Said an opportunity to cure any defects in the condition of the truck before plaintiff filed suit. As a result of these rulings, the court denies both of Citizens's motions and grants in part and denies in part Mr. Said's and SAS's joint motion for summary judgment.

### I. Facts [1]

This controversy centers around a 1984 Chevrolet pickup truck (truck) purchased by SAS from Metro Auto Auction (Metro) on September 15, 1992. SAS bought the truck by draft. When a vehicle is bought by draft, Metro's standard practice is to send a bill along with the title of the vehicle to the purchaser's bank, which in this case was Citizens. As standard practice, Metro includes with the bill and title any odometer statements referring to the purchased vehicle. The title and odometer statements that existed when SAS bought the truck indicated mileage in excess of 150,000 miles. When the draft arrives at Citizens, the bank holds

---

1. The following facts are either uncontroverted or presented as viewed in the light most favorable to Mr. Maberry. Some of the facts are "uncontroverted" because Mr. Maberry's denial of defendants' fact statements was not supported by evidence that at least raised an inference that the fact might be other than defendants stated. The court's repeated use of the term "allegedly" reflects both parties' failure to fully lay a factual record of the chronology of events giving rise to this action.

it for SAS. Citizens notifies SAS and either Sameer Said or Calvin Said comes to the bank and inspects the title attached to the draft and decides whether to pay or, if there is a problem with the draft, whether to send it back to Metro without payment. Citizens is not involved with this decision and does not examine the title or documents at that time. The draft and associated documents remain at the bank until SAS pays the draft. After SAS pays Citizens, the bank pays Metro. Citizens received a draft relating to the truck from Metro on October 19, 1992. Citizens paid the draft on October 27, 1992.

The association between Citizens and SAS extends beyond the loan on Mr. Maberry's truck. During the early 1990s, SAS sold the majority of its notes to Citizens. Citizens made ten loans to SAS from 1988 to 1994. At one time, Citizens was SAS's only floor planner and Citizens financed SAS through May of 1995.

In early to middle October of 1992, Mr. Maberry began examining the truck for purchase. Mr. Maberry is an experienced buyer, having purchased nine cars or trucks over the past ten years and, in the past five years, having purchased three cars from SAS. Mr. Maberry thoroughly inspected the truck. He went to SAS to look at the truck at least four times and took at least two test drives. In addition, his brother-in-law, Larry Magness examined the truck several times.

During Mr. Maberry's examination of the truck, three people who worked at SAS made representations to him. Robert Mayfield, the primary salesperson, and Calvin Said told Mr. Maberry that the truck had low miles. Mr. Mayfield and Sameer Said told Mr. Maberry that they would put a Target engine in the truck. No employee of Citizens discussed with Mr. Maberry either the truck's mileage or mechanical condition.

As Mr. Maberry became interested in purchasing the truck, SAS began exploring financing options. At that time, Mr. Maberry was financing through Citizens two cars previously purchased from SAS. The decision was made to finance the truck through Citizens also.

Citizens often finances vehicles by purchasing the promissory note from the dealer. Commonly, when a dealer and purchaser talk about financing a vehicle, the dealer has the purchaser fill out a loan application. The dealer then submits the loan application to Citizens for review. Citizens determines what changes need to be made before the bank would be willing to purchase the note from the dealer. In making this determination, Citizens evaluates factors such as the following: the bank's relationship with the dealer; the debtor's job stability; the debtor's income; whether the bank has recourse against the dealer should the debtor fail to pay; the debtor's credit history; the collateral's year, make and mileage; the loan term; and the interest rate. In addition, the loan officer handling the application generally looks at the title of the vehicle, if it is available, to make sure it has been signed properly, has been notarized, and to make sure the dealer assignment has been placed on the title. After Citizens approves a loan application, the dealer sells the vehicle to the customer according to the pre-approved terms. The dealer then sells the promissory note to Citizens.

Using this procedure, Mr. Mayfield submitted Mr. Maberry's loan application to Citizens for approval. With the loan application, Mr. Mayfield submitted a used vehicle order, an odometer disclosure statement, the security agreement and an Application for Missouri Title and License. None of the documentation that Mr. Mayfield submitted to Citizens, including an odometer disclosure statement and title application, indicated that the truck had over 52,560 miles on it. Herb Marsh, a loan officer at Citizens, evaluated the loan. Mileage was not a deciding factor in approving this particular loan. Mr. Maberry had established an excellent credit record with Citizens by never being delinquent on his other loan payments and, furthermore, the loan contract gave Citizens recourse against SAS. Citizens approved the loan application of Mr. Maberry.

On October 23, 1992, Mr. Maberry purchased the truck. To finance the purchase, he signed a security agreement including a promissory note, which named SAS as the

secured party. SAS then sold the agreement to Citizens. Under the terms of the agreement between Citizens and SAS, Citizens purchased the note with recourse; if Mr. Maberry failed to make his payments, SAS was required to pay the outstanding balance of the loan.

To issue a new title on a Missouri vehicle, an Application for Missouri Title and License must be filed with the Missouri Department of Revenue, Motor Vehicle Bureau. The application has a place for a lienholder to record its lien. Typically, the dealers with which Citizens dealt filled out the application. Citizens would then submit the application to the state along with the title and any odometer statements pertaining to the vehicle.

The title paperwork was submitted to the state after Mr. Maberry purchased the truck. The Motor Vehicle Bureau originally rejected the paperwork for an unknown reason. After the necessary corrections were made, the Missouri Motor Vehicle Bureau issued a title in Mr. Maberry's name. The Missouri title states that the truck had 52,560 miles on it.

At the time Mr. Maberry purchased the truck, he believed that the five digit odometer indicated the actual mileage. Plaintiff later discovered that, in reality, the truck had 152,560 miles on it at the time of sale. After making that discovery, Mr. Maberry stopped making payments on the truck. Up to that point, he had made six payments totally $779.88.

After Mr. Maberry stopped making payments, Citizens exercised its recourse right. SAS allegedly paid Citizens the outstanding balance on the note sometime in 1993. Allegedly in November 1994, SAS questioned the authority of Mr. Mayfield to assign the note with recourse. Citizens refunded the recourse payments and charged off the note. As standard procedure, when Citizens charges off a note, it files a credit report with the credit bureau and Telecheck Services, Inc. (Telecheck). Citizens followed its standard procedures when charging off Mr. Maberry's note.

In July of 1995, Mr. Maberry applied for a loan from MBNA America (MBNA). He intended to use the proceeds of the loan to pay for medical expenses incurred by his wife, household goods and legal expenses. MBNA turned down the application. Mr. Maberry then obtained a credit report and discovered that Citizens had issued a negative credit report to the credit bureau and Telecheck based on Citizens's charge off of the note.

Mr. Maberry's medical debts are structured to be made in installments. The installment payments have not been paid but the care providers have not taken steps to force collection. Mr. Maberry is not certain whether or not he is paying interest on the medical debts but to the best of his knowledge he is not.

No other credit applications by Mr. Maberry have been denied but at least one check has been rejected because of Citizens's charge off. After discussions with Mr. Maberry, Telecheck has stated that its merchants will not turn down Mr. Maberry's checks on the basis of the Citizens charge off.

On the basis of these facts, Mr. Maberry alleges that Citizens violated the following statutes: first, the Federal Odometer Law, 15 U.S.C. § 1988; second, the Kansas Consumer Protection Act, K.S.A. § 50–623; and third, the Missouri Unlawful Merchandising Practices Act, R.S.Mo. § 407.020. Mr. Maberry further claims that Citizens's actions and omissions regarding mileage representations and Citizens's submission of false and improper credit reports in retaliation for this lawsuit constitute tortious acts. Finally, Mr. Maberry asserts that under the Federal Trade Commission's "Holder Rule", Citizens is liable for each of the claims against Mr. Said and SAS.

Mr. Maberry's claims against Mr. Said and SAS are similarly diverse. Mr. Maberry maintains that Mr. Said and SAS committed violations of the following statutes: first, the Federal Odometer Law, 15 U.S.C. § 1988; second, the Kansas Consumer Protection Act, K.S.A. § 50–623; third, the Kansas Odometer Law, K.S.A. § 50–651; fourth, the Kansas Vehicle Dealers and Licensing Act,

K.S.A. § 8–2401[2]; and fifth, Kansas's Uniform Commercial Code, K.S.A. § 84–2–314. Mr. Maberry further contends that Mr. Said and SAS committed fraud by their actions and omissions regarding mileage representations and by their actions and omissions regarding the truck's condition. Finally, Mr. Maberry asserts that Mr. Said and SAS breached express and implied warranties.

## II. *Legal Standard*

When considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the nonmoving party. *Jones v. Unisys Corp.,* 54 F.3d 624, 628 (10th Cir.1995). A moving party who bears the burden of proof at trial is entitled to summary judgment only when the evidence indicates that no genuine issue of material fact exists. Fed.R.Civ.P. 56(c); *Anglemyer v. Hamilton County Hosp.,* 58 F.3d 533 (10th Cir.1995). If the moving party does not bear the burden of proof at trial, it must show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

Once the movant meets these requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). The nonmovant may not merely rest on the pleadings to meet this burden. *Id.* Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. at 2511; *Tersiner v. Union Pacific R.R.,* 740 F.Supp. 1519, 1522–23 (D.Kan. 1990). More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex,* 477 U.S. at 327, 106 S.Ct. at 2555.

## III. *Citizens's Motions*

### A. *Fraud in the Mileage Representations*

The court denies summary judgment on this count. As a basis for summary judgment on this count, Citizens relies on Kansas law. Missouri law, rather than Kansas law, governs this count, however. Accordingly, Citizens has not stated the proper standard, nor shown that no questions of material fact exist under that standard. Summary judgment is therefore inappropriate.

■ A federal court sitting in diversity must apply the substantive law of the state in which it sits, including that state's choice of law rules. *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). Thus, this court looks to Kansas law to determine which state's laws should be applied.

■ With respect to plaintiff's tort claims, Kansas follows the *lex loci delicti* approach, meaning that the law of the "place of the wrong" controls. *Ling v. Jan's Liquors,* 237 Kan. 629, 634, 703 P.2d 731 (1985). The "place of the wrong" is that place where the last event necessary to impose liability took place. *Id.* at 634–35, 703 P.2d 731; *see also* Restatement of Conflicts § 377 (1934). In a misrepresentation or fraudulent omission claim, the "last event" is the injury, so the law of the place of injury applies. *See Raymark Indus., Inc. v. Stemple,* 714 F.Supp. 460, 464 (D.Kan.1988). When a person sustains a loss by misrepresentation or fraudulent omission, "the place of wrong is where the loss is sustained." *See id.* (citing Restatement of Conflicts § 377 n. 4). The law of the place where the "effects" of the fraud were felt controls. *Seitter v. Schoenfeld,* 678 F.Supp. 831, 836 (D.Kan.1988).

■ Mr. Maberry lives in Missouri. He has allegedly suffered monetary damages from the Citizens representations and omissions. The only evidence before the court indicates that these injuries, if suffered at all, were suffered in Missouri. The court therefore finds that Missouri law, not Kansas law,

---

**2.** Although Mr. Maberry's second amended complaint includes Citizens in this count, his response to Citizens's first summary judgment motion states that this charge is brought against only Mr. Said and SAS. The court therefore grants Citizens summary judgment on this count.

governs Mr. Maberry's fraudulent misrepresentation and omission claim. Citizens's failure to establish that no material questions of fact exist under Missouri law precludes summary judgment.

### B. *The Federal Odometer Statute*

Mr. Maberry brings his federal odometer claim pursuant to 15 U.S.C. § 1988, the statute in effect when the events at issue occurred. Subsection (a) directs the Secretary of Transportation to prescribe rules requiring any transferor to give written disclosure to the transferee of (1) the cumulative mileage registered on the odometer and (2) that the actual mileage is unknown, if the odometer reading is known to the transferor to be different from the number of miles the vehicle has actually traveled. Pursuant to this statutory mandate, the Secretary of Transportation promulgated odometer disclosure rules. 49 C.F.R. §§ 580.1–580.16.

■ Section 1988 and its interpretive regulations impose liability only on a "transferor" that acts with intent to defraud. 15 U.S.C. § 1989; 49 C.F.R. § 580.3. Citizens contends that it is not a transferor and that the record is devoid of evidence that it intended to defraud Mr. Maberry.

■ A transferor is "any person who transfers his ownership of a motor vehicle by sale, gift, or any means other than by the creation of a security interest, and any person who, as agent, signs an odometer disclosure statement for the transferor." 49 C.F.R. § 580.3. Typically, the transferor will be the owner of the vehicle in question. *Bishop v. Mid–America Auto Auction, Inc.*, 807 F.Supp. 683, 685 (D.Kan.1992). If, however, a non-owner and owner are involved in a scheme of fraudulent conduct, the non-owner will be considered a transferor also. *See id.* at 686. Mr. Maberry alleges that Citizens joined SAS's fraud in two ways: first, Citizens knew about the fraud but remained silent and accepted the benefits; second, Citizens conspired with SAS to defraud him. Due in large part to its failure to correctly identify the law governing the fraud claim, Citizens has not carried its initial summary judgment burden to establish that neither of Mr. Maberry's fraudulent scheme theories has merit. Summary judgment on the basis of this theory is therefore denied.

■ To establish intent to defraud under the Federal Odometer Statute, Mr. Maberry must show that Citizens "had actual or constructive knowledge of the mileage/odometer discrepancy." *Haynes v. Manning*, 717 F.Supp. 730, 734 (D.Kan.1989) (citing *Williams v. Toyota of Jefferson, Inc.*, 655 F.Supp. 1081, 1085 (E.D.La.1987)), *rev'd on other grounds*, 917 F.2d 450 (10th Cir.1990). When viewed in a light most favorable to plaintiff, the record raises an inference that Citizens had such knowledge.

When one of its vehicles is purchased, Metro's standard procedure is to attach to the draft the vehicle's title and any odometer statements. The truck's title and the odometer statements existing at the time of SAS's purchase showed the truck's mileage to be in excess of 150,000 miles. At this stage of the proceeding, the court must grant Mr. Maberry the inference that Metro attached the title and odometer statements to the draft Citizens received on October 19, 1992.

As standard procedure, a Citizens loan officer determining whether to purchase a note from an auto dealer will review the documents submitted by the dealer as well as the title to the vehicle, if available. The documents submitted by Mr. Mayfield in connection with Mr. Maberry's loan application stated that the mileage of the truck just exceeded 50,000 miles. These documents were submitted to the bank prior to Mr. Maberry's purchase of the truck. As a result, prior to the date Mr. Maberry bought the truck, Citizens had within its possession documents indicating the mileage discrepancy. These documents were in the possession of a single loan officer who, as standard practice, reviewed them.

Mileage is one factor in Citizens's decision to purchase a note. Thus, even though mileage was not a deciding factor in the purchase of Mr. Maberry's note, viewing the evidence in a light most favorable to Mr. Maberry, the court finds that Citizens knew about the mileage discrepancy. Therefore, the court cannot conclude as a matter of law that

Citizens did not intend to defraud. Summary judgment on this basis is denied.

## C. *Kansas Consumer Protection Act*

 The Kansas Consumer Protection Act (KCPA) was enacted, among other reasons, to protect consumers from suppliers who commit deceptive and unconscionable practices. K.S.A. § 50–623. The "willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact" by a supplier violates the KCPA. K.S.A. § 50–626(b)(3). Citizens requests summary judgment on the basis that nothing in the record raises an inference that it wilfully failed to disclose a material fact. The court disagrees.

The Kansas Supreme Court has defined wilful as "[a]n act performed with a designed purpose or intent on the part of a person to do wrong or to cause an injury to another." *Folks v. Kansas Power and Light Co.*, 243 Kan. 57, 74, 755 P.2d 1319, 1333 (1988). Viewing the evidence in a light most favorable to plaintiff, the record raises an inference that the designed purpose or intent of Citizens was to do wrong or to cause an injury to Mr. Maberry by withholding information about the mileage discrepancy. As noted previously, the court must assume that Citizens knew about the mileage discrepancy of 100,000 miles—a material discrepancy by any reasonable standard. Furthermore, Citizens had a long standing, multi-faceted financing relationship with SAS. It is reasonable to assume that Citizens would not want to hurt a longstanding and valued customer. Under these circumstances, the court concludes that the record raises an inference that Citizens wilfully failed to disclose a material fact.

## D. *FTC Holder Rule*

In the pretrial order, Mr. Maberry asserts that "[a]ll claims against Mr. Said and SAS are also brought against Citizens under the contract provision implementing the FTC abolition of the holder in due course rule, seeking the same damages." The contract provision referred to appears on the front of the agreement in capitalized, bold-faced print and reads:

**NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.**

Mr. Maberry signed the agreement directly above this provision.

 Mr. Maberry maintains that his claims under this count are based on the plain language of the contract as well as on the FTC holder rule. Citizens does not address Mr. Maberry's theory that the plain language of the contract authorizes this count. In response to Mr. Maberry's second theory, Citizens contends that his use of the FTC holder rule is improper. According to Citizens, the FTC holder rule may only be used as a shield. That is, if Citizens brought suit against Mr. Maberry, he could assert as a defense against Citizens any claim or defense he has against SAS. Because Mr. Maberry is trying to use the FTC holder rule as a sword, *i.e.* to impose liability, Citizens seeks summary judgment. Finally, Citizens argues that, irrespective of Mr. Maberry's theory of recovery, his damages are limited by the plain language of the provision to the amounts paid by Mr. Maberry to Citizens.

Title 16 C.F.R. § 433.2, which interprets the Federal Trade Commission Act (FTCA), mandates that consumer credit contracts contain the notice provision displayed in the security agreement between SAS and Mr. Maberry. The phrase "FTC holder rule" stems from this language. The parties's dispute over the FTC holder rule is a dispute over what rights this language imparts to consumers against subsequent holders of the note. The Tenth Circuit has not addressed this issue. Citizens points to no case adopting its interpretation of the FTC holder rule. Citizens merely points out that courts have consistently interpreted section 9–318 of the

Uniform Commercial Code (UCC),[3] which contains similar language, to permit only the defensive use against a subsequent holder the claims and defenses the consumer has against the original lender.

This court believes the Tenth Circuit would begin its analysis of this question by examining the plain language of the FTC holder rule. Both the plain language and the history of the rule suggest that the FTC intended to permit a consumer to either assert defenses or bring affirmative claims.

The language mandated by the FTCA reads "any holder of this consumer credit contract is subject to all claims and defenses which the debtor could assert against the seller...." The language is unambiguous. The language nowhere suggests that the debtor's claims and defenses can only be used defensively. Thus, the plain language of the provision authorizes affirmative use.

Examination of the history of the rule confirms this conclusion. The FTC adopted the FTC holder rule because it believed it was "an unfair practice for a seller to employ procedures in the course of arranging the financing of a consumer sale which separate[d] the buyer's duty to pay for goods or services from the seller's reciprocal duty to perform as promised." 40 Fed.Reg. 53522 (Nov. 18, 1975). The FTC explained:

> "Our primary concern ... has been the distribution or allocation of costs occasioned by seller misconduct in credit sale transactions. These costs arise from breaches of contract, breaches of warranty, misrepresentation, and even fraud. The current commercial system which enables sellers and creditors to divorce a consumer's obligation to pay for goods and services from the seller's obligation to perform as promised, allocates all of these costs to the consumer/buyer."

*Id.* Having stated its concerns, the FTC turned to the FTC holder rule.

[The FTC holder rule] is directed at the preservation of consumer claims and defenses. It will *require that all consumer* credit contracts generated by consumer sales include a provision which allows the consumer to assert his sale-related claims and defenses against any holder of the credit obligation. From the consumer's standpoint, this means that a consumer can (1) defend a creditor suit for payment of an obligation by raising a valid claim against the seller as a setoff, and (2) maintain an affirmative action against a creditor who has received payments for a return of monies paid on account. The latter alternative will only be available where a seller's breach is so substantial that a court is persuaded that rescission and restitution are justified.

40 Fed.Reg. 53524 (Nov. 18, 1975). Furthermore, the FTC considered and rejected the interpretation advocated by Citizens here:

> Many industry representatives suggested that the rule be amended so that the consumer may assert his rights only as a matter of defense or setoff against a claim by the assignee or holder. Industry representatives argued that such a limitation would prevent the financier from becoming a guarantor and that any limitation in the extent of a third party's liability was desirable. The practical and policy considerations which militate against such a limitation on affirmative actions by consumers are far more persuasive.

40 Fed.Reg. 53526 (1975). These quotations make the FTC's intent clear. The purpose of the FTC holder rule is to abrogate the *holder in due course rule from the UCC in* consumer credit transactions. The FTC holder rule reallocates the cost of seller misconduct from the consumer to the creditor. *Music Acceptance Corp. v. Lofing,* 32 Cal. App.4th 610, 39 Cal.Rptr.2d 159, 170 (1995); *Home Sav. Ass'n v. Guerra,* 733 S.W.2d 134, 135 (Tex.1987).

---

**3.** That section provides in pertinent part:

(1) Unless an account debtor has made an enforceable agreement not to assert defenses or claims arising out of a sale as provided in section 84-9-206 the rights of an assignee are subject to

(a) all the terms of the contract between the account debtor and assignor and any defense or claim arising therefrom; and
(b) any other defense or claim of the account debtor against the assignor which accrues before the account debtor receives notification of the assignment.

In light of the plain language and the legislative history of the FTC holder rule, the court concludes that, under appropriate circumstances, the FTC holder rule permits consumers to assert affirmatively against a subsequent holder of a note those claims that the consumer has against the original lender. *Accord Eachen v. Scott Housing Systems, Inc.*, 630 F.Supp. 162, 166 (M.D.Ala.1986). Citizens does not argue that the circumstances of this case do not present the appropriate circumstances for affirmative use. Nor does Citizens challenge the rule-making authority of the FTC.[4] Instead, Citizens relies exclusively on its position that the FTC holder rule authorizes only defensive use. Accordingly, summary judgment is denied.

Turning to Citizens's damages argument, Mr. Maberry made loan payments of $779.88 to Citizens and both parties agree that Mr. Maberry would be entitled to this amount should be recover on this count. Mr. Maberry, however, asserts that, pursuant to the FTC holder rule, he is also entitled to recover the net value of the Volvo he traded in on the truck.[5]

Citizens agrees that for purposes of the FTC holder rule, the amount paid hereunder includes any trade in or down payment made. In its next breath, however, Citizens asserts that Mr. Maberry is not entitled to the Volvo's trade in value because the trade in was made to SAS, not Citizens. The court disagrees. Mr. Maberry does not lose rights by virtue of the assignment of the note to Citizens. If SAS held the loan, the trade in would be considered payment "hereunder". 41 Fed.Reg. 20023 (May 14, 1976). Mr. Maberry can assert any claim or defense against Citizens that he could against SAS. Therefore, the FTC holder rule authorizes Mr. Maberry to recover the trade in value from Citizens, which, in turn could consider what its rights might be against SAS.

### E. Credit Report—Statutory Claim

After Citizens returned the recourse paid to SAS, the bank charged off the note. Citizens reported this action to Telecheck and a credit bureau. Mr. Maberry contends that Citizens's reporting violated the Missouri Unlawful Merchandising Practices Act (MUMPA), R.S.Mo. § 407.020 and its interpretive regulations, Mo.Code Regs. tit. 15, § 60–8.010 *et seq.* In addition or in the alternative, Mr. Maberry states that Citizens's act of reporting violated the KCPA. Thus, the initial question presented is whether the MUMPA or KCPA, or both, covers Citizens's conduct.

The Missouri Supreme Court has held that the deception prohibited by R.S.Mo. § 407.020 is a species of fraud. *State ex rel. Nixon v. Telco Directory Publishing*, 863 S.W.2d 596, 600 (1993) (en banc). This suggests that the Kansas Supreme Court might apply the Kansas the choice of law rule for common law torts, stated earlier in this opinion. Under such a rule, MUMPA would provide the applicable law because the alleged injury occurred in Missouri.

MUMPA, however, is not a mere codification of common law fraud. In the language of R.S.Mo § 407.020, the Missouri legislature defines the species of fraud prohibited by MUMPA as fraud occurring "in connection with the sale ... of any merchandise ... in or from the state of Missouri." In this case, Mr. Maberry claims that Citizens, a Kansas bank, issued a false and fraudulent credit report from Kansas to a credit bureau of unknown citizenship. Such behavior does not fall within the MUMPA's stated scope. The court's research has revealed no case imposing liability under MUMPA where the allegedly deceptive conduct occurred outside Missouri.

---

**4.** The FTC promulgated the FTC holder rule pursuant to the authority granted by the FTCA. 15 U.S.C. § 45. When Congress explicitly or implicitly delegates to agencies the power to elucidate a specific provision of a statute, the resulting agency action is entitled to deference. *Southeast Kansas Community Action Program Inc. v. Secretary of Agriculture*, 967 F.2d 1452, 1460 (10th Cir.1992). "The power to implement regulations necessarily involves the power to interpret the statute. Thus, [a court] must give deference to the Secretary's interpretation of the statute as manifested in the regulations." *Id.* Citizens has offered no argument why this deference should not be applied in this case.

**5.** Mr. Maberry also asserts his right to attorney's fees. Consideration of this question is premature.

Furthermore, the Kansas Supreme Court has held that "a state is sovereign only within its own boundaries and its laws have no extraterritorial force." *Head v. Platte County, Missouri*, 242 Kan. 442, 444, 749 P.2d 6, 7 (1988) (citing *State v. Holcomb*, 85 Kan. 178, 116 P. 251 (1911)). Thus, this court concludes that, under these circumstances, the Kansas Supreme Court would hold that MUMPA, by its terms, does not reach Kansas conduct and, even if it did, the law would have no force in a Kansas court.[6] This court therefore holds that the KCPA, not MUMPA, governs Mr. Maberry's claim. Citizens's summary judgment motion refers exclusively to MUMPA. As a result, Citizens's motion is denied.

### F. Credit Reports—Tort Claims

■ In the pretrial order, Mr. Maberry states that "[a]ll credit reporting claims are brought against Citizens under the several theories stated in *Franklin v. Mercantile Trust Co.*, 650 S.W.2d 644 (Mo.App.1983)." The plaintiff in *Franklin* asserted the following theories: economic embarrassment, interference with prospective advantage, negligence, tortious interference with contract, prima facie tort, and injurious falsehood. The court noted that Missouri has recognized each of these theories except for the torts of economic embarrassment or interference with a prospective advantage. *Id.* at 674. Since the *Franklin* decision, Missouri courts have recognized interference with a prospective advantage as a valid tort theory. *See Riley v. L.J. Schuster Co.*, 844 S.W.2d 521 (Mo.Ct.App.1992).

In its motion for summary judgment, Citizens states that "the *Franklin* court expressly endorsed only tortious interference with contract as an appropriate cause of action." Citizens misreads *Franklin*. The *Franklin* court initially determined that the elements instruction given by the trial court failed to correspond to any of the theories stated by the plaintiff. *Franklin*, 650 S.W.2d at 648. On this basis, the court held the instruction to be erroneous, reversed the judgment of the trial court, and remanded the case for a new trial.

In addition to appealing the propriety of the instruction, the defendant in *Franklin* appealed the trial court's refusal to grant the defendant a directed verdict. To rule on this point, the appellate court asked "whether [the plaintiff] might make a submissible case on any of [his] theories." *Id.* The court initially examined the theory of tortious interference with contract and found evidence warranting submission of this claim to the jury. *Id.* Having made this finding, the court stated, "We need not dwell on whether plaintiff made a submissible case on the other theories he presented on appeal." *Id.* at 649.

Thus, the *Franklin* court did not "expressly endorse[ ] only tortious interference with contract as an appropriate cause of action" as Citizens suggests. This court holds that Mr. Maberry has preserved in the pretrial order those claims stated by the plaintiff in *Franklin* that have been recognized by Missouri courts: interference with prospective advantage, negligence, tortious interference with contract, prima facie tort, and injurious falsehood.[7] Citizens's motion addresses only tortious interference with contract.

■ A prima facie case of tortious interference with contract requires a plaintiff to prove "(1) a contract or valid business expectancy; (2) defendant's knowledge of the contract or relationship; (3) a breach induced or caused by defendant's intentional interfer-

---

6. Although not bound to apply another state's statute, the *Head* court recognized that a state may apply another jurisdiction's laws as a matter of comity—"a principle by which the courts of one state or jurisdiction give effect to the laws and judicial decisions of another, not as a matter of obligation, but out of deference and respect." *Id.* 242 Kan. at 447, 749 P.2d at 9. Under the circumstances of this case, application of MUMPA through comity is inappropriate. As stated above, even if applicable, MUMPA does not afford a basis for relief. Moreover, Mr. Maberry

has alternatively pled that Citizens's conduct violates KCPA. Accordingly, declining to apply MUMPA does not leave Mr. Maberry without a potential remedy.

7. Mr. Maberry has not pointed to any Missouri case recognizing the tort of economic embarrassment. Nor has the court's research revealed any. Accordingly, Mr. Maberry may not proceed on this theory.

ence; (4) absence of justification; and (5) damages." *Nazeri v. Missouri Valley College,* 860 S.W.2d 303, 316 (Mo.1993) (en banc). Citizens contends that the record is devoid of any evidence suggesting that it intended to interfere with Mr. Maberry's contracts or business expectancies, that Mr. Maberry cannot demonstrate an absence of justification, and that Mr. Maberry suffered no damages from the credit report. None of these contentions merit summary judgment.

Missouri draws its definition of intent from the Restatement (Second) of Torts. In *Francisco v. Kansas City Star Co.,* 629 S.W.2d 524, 530 (Mo.Ct.App.1981), the court stated the following:

> The element of intent in [tortious interference with contract] actions has been delineated by the RESTATEMENT OF TORTS 2d, § 766, Comment j (1979) as:
>
> j. Intent and purpose. The rule stated in this Section is applicable if the actor acts for the primary purpose of interfering with the performance of the contract, and also if he desires to interfere, even though he acts for some other purpose in addition. The rule is broader, however, in its application than to cases in which the defendant has acted with this purpose or desire. It applies also to intentional interference, as that term is defined in § 8A, in which the actor does not act for the purpose of interfering with the contract or desire it but knows that the interference is certain or substantially certain to occur as a result of his action. The rule applies, in other words, to an interference that is incidental to the actor's independent purpose and desire but known to him to be a necessary consequence of his action.

Further, in § 766, under Comment h, the following is found:

> The essential thing is the intent to cause the result. If the actor does not have this intent, his conduct does not subject him to liability under this rule even if it has the unintended effect of deterring the third person from dealing with the other.

Restatement of Torts 2d, § 8A (1965) reads:

8A. Intent

> The word 'intent' is used throughout the Restatement of this Subject to denote that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it.

In addition to the burden of proof required of a plaintiff as prescribed in *Tri–Continental [Leasing Co. v. Neidhardt],* supra, [540 S.W.2d 210] [Mo.App.1976], it has been declared in *Gerstner Electric, Inc. v. American Insurance Company,* 520 F.2d 790, 794 (8th Cir.1975):

> "To recover in Missouri on a claim for wrongful interference with a contract by inducing its breach, the wrongful act must be intentionally done. *Beggs v. Universal C.I.T. Credit Corp.,* 409 S.W.2d 719, 722 (Mo.1966). There must be proof that the defendant not only intended to commit an act which is ascertained to be wrongful but also that he knew it was wrongful at the time he did it."

In its memorandum, Citizens selectively quotes from this language in support of its position. Seizing on language from comment h and *Gerstner Electric,* Citizens, in essence, asserts that its primary purpose for reporting was not to interfere with Mr. Maberry's contracts.

Citizens ignores the definition of intent found in § 8A and the discussion from comment j. This language is the only language cited by the parties or uncovered by the court in which a Missouri court defines intent for purposes of this tort theory. Viewing the evidence in the light most favorable to Mr. Maberry, the record raises the inference that Citizens knew that its negative credit reports were certain or substantially certain to interfere with Mr. Maberry's ability to get loans. As a result, summary judgment on this basis is denied.

 "Absence of justification is the absence of any legal right on the part of the defendant to take the actions about which a plaintiff complains." *SSM Health Care, Inc. v. Deen,* 890 S.W.2d 343, 346 (Mo.Ct.App. 1994). More specifically, "[n]o liability arises for interfering with a contract or business

expectancy if the action complained of was an act which the defendant had a definite legal right to do without any qualification." *Community Title Co. v. Roosevelt Federal Savings and Loan Ass'n,* 796 S.W.2d 369, 372 (Mo.1990) (en banc). "[T]here is no impropriety of self-interested interference when a defendant has a legitimate economic interest in the contract or expectancy." *Id.* A party is not justified, however, to interfere by employing improper means. *Lay v. St. Louis Helicopter Airways, Inc.,* 869 S.W.2d 173, 178 (Mo.Ct.App.1993). Improper means are those that are independently wrongful, notwithstanding injury caused by the interference, *e.g.* misrepresentation of fact, threats, violence, defamation or any other wrongful act recognized by statute or common law. *Id.* The plaintiff has the burden of proof at trial to establish that the defendant interfered by improper means. *SSM Health Care, Inc.,* 890 S.W.2d at 347.

Citizens claims that its credit report resulted from the bank's pursuit of its legitimate economic interests. The only interest Citizens cites is the interest it shares in common with the members of its credit bureau service: the interest in ensuring that accurate information is made available concerning the credit status of potential customers. Moreover, Citizens alleges that it has a legal duty to report the credit status of potential customers to the other members of the service. As a result, Citizens maintains that Mr. Maberry cannot prove absence of justification.

Citizens cites no evidence or legal authority to support its claim that it has a legal duty to report the status of Mr. Maberry's loan. The record nowhere suggests the existence of a contract between Citizens and the credit bureau. The court must therefore assume for purposes of this motion that no legal duty obligates Citizens to make credit reports.

Whether or not Citizens has a legally enforceable duty to make credit reports, Mr. Maberry does not dispute that the bank has an economic interest in making them under the appropriate circumstances. Rather, Mr. Maberry states that the events surrounding the truck's loan should not have affected his credit status. As a result, argues Mr. Maberry, Citizens's issuance of a negative credit report was not in furtherance of Citizens's interest in providing accurate information to the credit bureau. Mr. Maberry contends that his credit status was not affected because (1) the note had been paid off before the credit report issued and (2) he had a right to withhold payment under the language of the note, the FTC holder rule and K.S.A. § 84-2-717.

Sometime between March and May 1993, Mr. Maberry stopped making payments on the loan. As a result, SAS began making recourse payments and paid off the loan sometime in 1993. On October 24, 1994, Mr. Maberry filed this action. Allegedly in November 1994, SAS questioned the authority of Mr. Mayfield to assign the note with recourse. Citizens refunded the recourse payments and then filed the negative credit report on November 10, 1994.

Because the recourse payments paid off the loan in December of 1993, Mr. Maberry asserts that it did not owe Citizens on the note at the time the credit reports were made. Therefore, according to plaintiff, Citizens's reports were false and fraudulent. In essence, this is a no harm, no foul argument; because Citizens received payment from any source, it had no right to report Mr. Maberry's lapse. The court rejects this position. Mr. Maberry's obligation to pay under the terms of the loan is independent of Citizens's recourse rights against SAS.

Mr. Maberry, however, contends that, pursuant to the language of the note, the FTC holder rule and K.S.A. § 84-2-717, he was not obligated to continue making payments. Because he had no obligation to pay, Mr. Maberry contends, his stoppage could not have affected his credit status. Without an altered credit status, Citizens had no justification to issue a negative credit report.

Each of these three theories appears to be based on a letter Mr. Maberry's prior attorney sent to Citizens on May 27, 1993. In that letter, Mr. Maberry's attorney informed Citizens that the truck SAS sold to Mr. Maberry had 152,560 miles on it rather than the 52,560 miles SAS represented. Mr. Maberry's attorney stated that his client's dam-

ages from this conduct would exceed the balance remaining on the note and that pursuant to K.S.A. 84–2–717, Mr. Maberry would be making no further payments.

K.S.A. § 84–2–717 provides: "The buyer on notifying the seller of his intention to do so may deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due under the same contract." The comment to this section states that "[i]n conformity with the general policies of this Article, no formality of notice is required and any language which reasonably indicates the buyer's reason for holding up his payment is sufficient." The letter sent to Citizens was valid notice under this standard. Therefore, Citizens, as SAS's assignee, had notice of the reasons why Mr. Maberry stopped payments and of statutory authority for that action.[8] Furthermore, although the letter does not mention the FTC holder rule or the plain language of the note, Citizens had possession of the note, which states that Mr. Maberry could assert against Citizens any claim or defense he had against SAS. The letter outlines Mr. Maberry's claim against SAS. Consequently, for alternative reasons, the letter suffices to raise the inference that Citizens was not justified in issuing a derogatory credit report. Summary judgment on this basis must therefore be denied.

Finally, Citizens asserts that Mr. Maberry cannot, as a matter of law, prove he was damaged by Citizens's credit report. The validity of this argument turns on the purposes for which Mr. Maberry sought the loan from MBNA, which was denied. Citizens contends that Mr. Maberry sought the loan for the sole purpose of paying his wife's medical bills. Citizens states that, after being rejected by MBNA, Mr. Maberry obtained more favorable credit directly from the medical care providers.

The court does not need to examine the credit extended by the medical care providers in order to rule on Citizens's argument.

In his affidavit, Mr. Maberry declares that he sought the loan to pay for attorney's fees and household expenses as well as medical expenses. Citizens makes no representation that Mr. Maberry received more favorable credit for the non-medical expenses. Accordingly, the purpose for the loan and whether Mr. Maberry can establish damages are material questions of fact that will be answered at trial.

### IV. *Said's and SAS's Motion* [9]

#### A. *Alter Ego*

Mr. Said argues that he is not personally liable for any of plaintiff's numerous claims because SAS maintained its corporate form and is not his alter ego. The court concludes that whether or not SAS is Mr. Said's alter ego is a question of material fact that cannot be resolved at this stage of the proceeding.

In support of his contention that SAS has maintained its corporate identity since its formation, Mr. Said cites his own deposition. The testimony cited, however, evinces an unfamiliarity with corporate formalities which alone might raise an inference that SAS is Mr. Said's alter ego. Mr. Maberry, however, points to additional evidence to support his alter ego theory. As the most telling example, he cites to the 1994 dealership renewal application for SAS. The application asks for the "business type." The blank is filled in with the term "individual", raising the inference that SAS is a sole proprietorship. Mr. Maberry points out additional similar evidence, review of which would be redundant. Whether or not SAS is Mr. Said's alter ego is a fact question that will be determined at trial.

Relying on his alter ego argument, Mr. Said moved for summary judgment on Mr. Maberry's Federal Odometer Act, fraud, KCPA and Kansas Odometer Statute claims. Accordingly, Mr. Said's motion with respect to those claims is denied.

---

8. Citizens does not attack the applicability of K.S.A. 84–2–717 to this action. As a result, the court does not address the question.

9. Mr. Said and SAS have not filed a reply brief. Because the time in which a reply must be filed has passed, D.Kan.Rule 7.1(b), Mr. Said and SAS have waived their right to reply. D.Kan.Rule 7.4.

**1408**

## B. *Warranty Claims*

Mr. Maberry has alleged that SAS and Mr. Said breached express and implied warranties. For this alleged violation, Mr. Maberry requests his actual damages and attorney's fees pursuant to the Magnuson–Moss Act, 15 U.S.C. § 2310(d). SAS and Mr. Said seek summary judgment for two reasons: first, Mr. Maberry did not request arbitration as required by 15 U.S.C. § 2310(a)(4) [sic]; and second, Mr. Maberry did not give SAS and Mr. Said an opportunity to cure prior to suit as required by 15 U.S.C. § 2310(e). The former argument is wholly without merit. On the latter theory, however, the court grants partial summary judgment.

Title 15 U.S.C. § 2310(a)(3) provides as follows:

One or more warrantors may establish an informal dispute settlement procedure which meets the requirements of the Commission's rules under paragraph (2). If—

(A) a warrantor establishes such a procedure,

(B) such procedure, and its implementation, meets the requirements of such rules, and

(C) he incorporates in a written warranty a requirement that the consumer resort to such procedure before pursuing any legal remedy under this section respecting such warranty,

then ... the consumer may not commence a civil action (other than a class action) under subsection (d) of this section unless he initially resorts to such procedure. . . .

Mr. Said and SAS point to no evidence in the record that an informal dispute settlement procedure was established, that the procedure meets the requirements of the rules, and that the warranties at issue in this case incorporated the requirement that the consumer resort to the dispute settlement procedure prior to filing suit. Unless each of these requirements has occurred, Mr. Maberry is not required to seek redress initially through the informal dispute settlement procedure. *Motor Vehicle Mfrs. Ass'n v. Abrams,* 899 F.2d 1315, 1317 (2d Cir.1990); *Wolf v. Ford Motor Co.,* 829 F.2d 1277, 1278

(4th Cir.1987); *Boelens v. Redman Homes, Inc.,* 748 F.2d 1058 (5th Cir.1984). Summary judgment on this theory is therefore denied.

Turning to SAS's and Mr. Said's second theory, 15 U.S.C. § 2310(e) provides in pertinent part:

No action ... may be brought under subsection (d) of this section for failure to comply with any obligation under any written or implied warranty or service contract ... unless the person obligated under the warranty or service contract is afforded a reasonable opportunity to cure such failure to comply.

Mr. Maberry contends that warranties existed regarding the mileage of the truck and regarding the truck's fitness for the ordinary purposes. To the extent a warranty guaranteed a low mileage truck, the court denies summary judgment because high actual mileage cannot be cured. To the extent, however, that a warranty guaranteed the fitness of the truck, the court grants summary judgment. Mr. Maberry does not assert, nor does the record indicate, that SAS and Mr. Said were afforded the opportunity to cure any defects in the truck's condition.

## V. *Order*

**IT IS THEREFORE BY THE COURT ORDERED** that Citizens's motion for summary judgment (Doc. # 58) is denied.

**IT IS FURTHER ORDERED** that Citizens's motion for summary judgment on Maberry's credit reporting claims (Doc. # 71) is denied.

**IT IS FURTHER ORDERED** that Mr. Said's and SAS's joint motion for summary judgment (Doc. # 62) is granted in part and denied in part.

**IT IS SO ORDERED.**